Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Megan Woodson, and I represent the appellant, James Carr. The unifying question amongst all of the issues presented on Mr. Carr's appeal are the extent to which the District Court properly dismissed Mr. Carr's complaint on the pleadings based on determinations that are largely factual in nature and therefore in all but the most extreme cases typically reserved for the finder of fact and or jury. Beginning with the question of Mr. Carr's efforts to maintain the secrecy of his business plan, the complaint adequately alleges circumstances that, drawing all inferences in Mr. Carr's favor, would indicate an expectation of confidentiality that the business plan was not to be used or disseminated without Mr. Carr being compensated or otherwise involved. And on this issue we are asking this Court to go ahead and answer the question in the manner that it indicated it was so inclined in the direct technologies case that reasonable secrecy measures can be inferred by the circumstances, in this case the transactional nature of Mr. Carr's interactions with Mr. Huizenga, Autonation, in which Mr. Carr did not just disclose the business plan unsolicited. He gave a general vague overview of the concept. Autonation then returned his call, contacted him, asked for more information once so far to send somebody to California to get more information, then told him that they were not going to proceed, and on Mr. Carr's request returned the business plan. This was similar to what happened to Mr. Carr in his dealings with Laidlaw, the other recipient of the business plan. And Laidlaw indeed did not move forward or take any action on the business plan after it returned it to Mr. Carr. The next question, beyond the reasonable efforts to maintain secrecy, is the statute of limitations question, on which the District Court found in Mr. Carr's favor denying Autonation's motion to dismiss on these grounds. The District Court correctly determined that notwithstanding the long passage of time, Mr. Carr adequately alleged that he did not know or have reason to know that Autonation and LKQ had misappropriated his trade secrets until he learned of LKQ's existence and Mr. Huizenga's connection to LKQ at a barbecue in 2015. Moving to the nexus between— Now, the District Court ruled only on the confidentiality issue. Is that right? Actually, it just wrote us on no. The District Court— It did not rule in a limitations period. It did rule in Mr. Carr's favor on the question of statute of limitations. That is that it was dependent on facts. Correct. Okay. Autonation's motion to dismiss on that ground was denied. But as it was raised again on this appeal, I wanted to revisit. Was the question whether this is even a trade secret, just looking at the document, litigated? There's some argument about it in the appellate briefs. Was it litigated in the District Court? No, Your Honor. That was not raised in either of the motions to dismiss. And that point was made in Mr. Carr's reply brief. And the inappropriateness of raising an issue for the first time on appeal, notwithstanding the fact that it is a legal determination, the prejudice— It was raised in the reply brief in the District Court. No. Pardon me, Your Honor. The reply brief—our reply brief in this Ninth Circuit appeal. Okay. We addressed Autonation's heavy reliance on that argument in their appellate response. Okay. But it was not raised in the District Court by either of the defendants nor the court and did not form part of the court's ruling. And therefore, Mr. Carr had no grounds to amend the complaint, especially given that Mr. Carr did not at that time have additional facts to allege to cure the District Court's in regards to secrecy measures and on the nexus between Mr. Carr and LKQ. And moving to that nexus between Mr. Carr and LKQ, LKQ argues in the District Court agreed that Mr. Carr has not alleged an adequate quick connection between him and LKQ because Mr. Carr had no direct dealings with anyone at LKQ. But what Mr. Carr did allege is sufficient circumstantial evidence to infer that LKQ not only obtained the subject matter of the business plan, but drawing all inferences in favor of Mr. Carr, that they had reason to believe that the business plan was wrongfully obtained. Beginning with whether or not LKQ actually received the business plan, Mr. Carr sent the business plan to Mr. Huizenga. Mr. Huizenga, as we noted in the—alleged in the complaint, had the number of businesses with which he was affiliated during his lifetime. Autonation is one of them. Mr. Huizenga apparently relayed the business plan to Autonation because it was Autonation— But that's speculation, right? I mean, it just ultimately comes down to there are, you know, two very rich people and they invest in a lot of things, and therefore you're assuming that Mr. Huizenga gave it to, you know, the founder of LKQ, right? I was beginning with the connection between Mr. Huizenga and Autonation. But, yes, in terms of Mr. Huizenga giving the business plan to Autonation, who eventually a reasonable inference is that Autonation gave the business plan to LKQ, is, again, you want to use the word speculation, I would argue that it is a reasonable inference based on the facts available to us at this early stage, given the free flow of information, people, and money among the Huizenga family. But one thing that struck me, and I don't know quite how it fits into this whole story, is that the original letter that Mr. Carr wrote said quite specifically that his plan was not to use acquisitions. And the actual operation immediately did 44 acquisitions. So it seems like they weren't following the plan. They weren't following the plan specifically, but that does not doom a trade secrets claim. It's not uncommon when a trade secret is implemented for it to be improved upon or variations to be made to the original plan. But the key to his plan was not to do acquisitions, and they did acquisitions. One of the frustrations here, from my point of view, is that I think your argument about the confidentiality isn't bad, but everything else about the case seems extremely dubious. To be sure that I'm responding to Your Honor's point. So in other words, I think the immediate question, which is whether the district judge properly concluded that on the complaint there was insufficient confidentiality, is a fair question. But then we have something that doesn't look a whole lot like a trade secret to begin with, and wasn't followed either, and wasn't sued on for 20 years. So reversing is just going to perpetuate a case that's not going anywhere. Not necessarily, Your Honor. The pleadings are very early. Mr. Carr has not had the benefit of discovery. He hasn't had an opportunity to develop most of these claims. Beginning with the question of whether or not it was a trade secret, well, in the first instance, we would contend that that's not appropriately raised in this court because Mr. Carr did not have the opportunity to amend his complaint on this issue that was not raised at the district court. Whether or not something is a trade secret is also a question of fact. Sitting here in 2020, we can say that this seems obvious. Most great business ideas do seem obvious. Well, what it looks like is a first-year MBA paper about, you know, analyzing industry. It's not exactly a genius piece of paper. But number one, it sees the potential in an industry that nobody else had seen the potential in before, or at least not been able to implement a winning business strategy on that front. And that's because even though these seem like small things, in 1996, they were not necessarily small things, things that were the prevailing industry practice likely to save money in what was seen as a kind of low-tech, lowbrow industry, for example, hiring the cheapest labor that you could and just paying them a salary, not using computer systems. Again, that seems like second nature to us now. Usually trade secrets are protected. And, I mean, I think the fact that this didn't happen until 20 years later suggests that he didn't – he wasn't – your client wasn't really invested in this. He sort of made a pitch and then he moved on and went to other areas and didn't really pursue it at all. And then 20 years later, he finds out that somebody, you know, did something similar. It's not unusual. It just – there seems to be a lot of speculation going into it. And I think that's the question is how far can we read your complaint. You're right. It's a motion to dismiss. It's on the complaint. But did you properly – what facts lead us to believe that this is something that should have been protected in the first place? Well, for example, you can see what an advantage it was to be the first person to – excuse me, the first company to implement a winning business plan. But that doesn't make the trade secret. I mean, people can do innovative things that aren't secrets, that don't – I mean, I always wonder, for example, why it took, you know, a thousand years for somebody to decide to put some wheels on suitcases. I mean, I don't think it's a secret. If somebody had written a piece of paper saying, I think I'll put some wheels on suitcases and someone else got the piece of paper, I doubt that that's a trade secret. It's just for some reason nobody ever did it. Maybe it's a trade secret. Maybe it isn't, Your Honor. Again, many things seem obvious in hindsight. Mr. Carr, he – number one, he talked about investing in more high-quality salespeople. Nobody had thought of that in connection with this industry before, based on the complaint. He wanted to actually have interconnected systems using new technology. Again, in 1996, that was somewhat of a novel idea, that leveraging emerging technologies to connect inventory nationwide could actually drive this industry that, up until then, had just basically been, quite frankly, junkyards. Understanding the environmental pitfalls that could doom a company like this that makes rapid acquisitions. And Mr. Carr, he advised, starting from scratch, that you didn't have to deal with the environmental legacy of an acquired company. But he didn't foreclose the possibility of acquisitions, just that one would need to be cautious to understand the environmental track record. These are things that only people who worked in the industry could understand. He said distinctly that he was not suggesting acquisitions, that he was affirmatively not suggesting acquisitions. That's correct, Your Honor, that he affirmatively stated that he considered building new junkyards from scratch to be optimal. That is not what LKQ did. But under the trade secrets law, that does not doom Mr. Carr's claim because acquirers of trade secrets can make improvements, changes, alterations to those trade secrets. Nonetheless, if the core concept was a trade secret, that will not change its trade secret, the nature of it being a trade secret. Is there anything in the record that says that Mr. Carr, at least explicitly or expressly, said this plan is confidential? I know you're saying you confer it from the circumstances. Is there anything where he told someone at AutoNation, treat this confidentially, this is along those lines? No, Your Honor. Our position is that it was inferred from the circumstances and his asking that the plan be returned, that AutoNation could have access to the business plan for the time it was considering, a business acquisition or relationship with Mr. Carr, but at that point it was no longer to have access. And I wanted to revisit Judge Nelson's comment about 20 years later somebody did something. This was not somebody. This was another affiliate. This was AutoNation started LPQ. And while AutoNation's name would suggest they were in general in the car business, they were in a different business. They're a car dealership. LPQ is automobile wrecking. AutoNation didn't do this, clearly. Otherwise, why did they send somebody from Florida to California to meet with a guy who happened to know about this auto wrecking industry? It was outside of their wheelhouse. Otherwise, they would have tossed Mr. Carr's letter in the trash and he never would have heard from them again. And Mr. Huizenga, who had this interconnected web of businesses, the media that is cited in the complaint, they even commented as to how incestuous Mr. Huizenga's business community seemed to be. It said, is Wayne Huizenga overdoing his self-dealing? It was his former affiliates from waste management, Dean Buntrock and Donald Flynn, who started LPQ. The S-1 registration statement, which AutoNation, I believe, had the court take judicial notice of in their opposition to the motion to dismiss, it gives the biographies of all LPQ's founders. None of them had an automobile wrecking background. They, I believe, made their first acquisition and then brought some of those existing yard owners into the business. But they made 44 acquisitions that first year. They came out of the gate hot.  They had a plan. They were following some sort of plan. The question is, where did they get that plan from? We know they didn't have the institutional knowledge at AutoNation. We knew that the people who started LPQ did not have this information, this background. It's a question that's not answered. Mr. Carr happened to send the plan to Mr. Huizenga. AutoNation got a hold of the plan. And then a few years later, AutoNation starts LPQ. It was the first stop, the acquaintance that the barbecue had, when Mr. Carr said, hey, that's funny. You work in that industry. I thought I had a billion-dollar idea, and I actually pitched it to Wayne Huizenga, and he sent somebody from AutoNation out to talk to me. He said, are you kidding? Wayne Huizenga and AutoNation started LPQ. He could immediately see that connection. That's an example of a reasonable person. And, again, these are all factual inquiries. If you want to reserve any time, you better do it now. Yes, I'm going to reserve. Thank you. Good morning. May it please the Court. Petter Batalden on behalf of Appellee AutoNation. I'm going to be sharing time with Mr. Rice, who separately represents LKQ. And I'm going to try to take the first nine of the 15 minutes. I'd like to start with Judge Lee's question about whether there's anything in the record that at all suggests efforts on Mr. Carr's part. Well, there certainly is stuff in the record that suggests efforts. I mean, first of all, he wrote a letter, but he didn't give the plan. And then he gave him the plan, and then when they didn't do anything, he asked for it back. Why was he asking for it back if he thought they could just use it? Your Honor, there are other explanations for why he might want it back. Yes, that's just one. I'm sorry. Including? Well, I think it's quite possible that he was irritated. He thought, you know, if you're not going to go into business with me, just send me the plan back. He was dealing exclusively in paper at this point, so he may have wanted the paper copy returned to him. But the key point is that the context is king. At this point in the process, he and Mr. Davis had had a series of communications, a series of meetings. They had exchanged some paperwork. I thought they had one meeting. At no point. I'm sorry? I thought they had one meeting. They had one meeting, and they had exchanged letters, and there was a phone call. It would be better to be accurate. I mean, you began by saying there's nothing in the record, and there's certainly something in the record. And now you're saying they had several meetings, but they had one meeting. Let's go on. Your Honor, I don't think that any of the engagements that they had up to the point when Mr. Carr asked for the plan back could possibly have suggested to Mr. Davis any intent on Mr. Carr's part to maintain confidentiality. None of the things that a reasonable person would do if he were seeking to protect the secrecy of the document were taken. There was no request for a nondisclosure or confidentiality. Well, something was done. He asked for it back. That's pretty – that's an unusual thing to do. Your Honor, I don't think it's unusual, and it wouldn't have – You gave a ridiculous reason in your brief. I mean, maybe he couldn't make copies. This was still 1997. He couldn't make copies. Any person who was intending to convey the idea that requesting the plan back was an effort to maintain secrecy would have done other things that go hand in glove with that. They would have said, for example, Carr would have said to Davis, you know, if you made any other copies of this, destroy them. If you took notes, throw them away. If you talked to anybody about it, you know, tell them not to disseminate that information. There were all kinds of things that a reasonable person in this position would have done to alert Mr. Davis that there was an effort to maintain secrecy. I mean, it seems to me that the closer-in point is that, you know, telling somebody some things about how you might organize businesses, nobody would think it was business. It was a trade secret because it doesn't sound like a trade secret. But that's sort of a different problem. Well, I certainly agree that it's not a trade secret, and we briefed that issue. Didn't raise it in the district court, is that right? That's correct. And as an appellee, AutoNation is entitled to raise any argument available in the record for affirmation. Well, our case law says that occasionally. But more accurately, it says anything raised in the district court. You can't just come up with new things. Well, Your Honor, the cases that Mr. Carr is relying on are cases where an appellant is restrained from raising new issues on appeal. Well, I'm saying that I know what the case law says because I've written some of it. And sometimes we say anything, but more accurately, we say anything raised in the district court, even if the district court didn't reach. Otherwise, you obviously ‑‑ I mean, we do another rule that says you can reach legal issues that weren't briefed below, and that's the applicable rule, but not the notion that you can just come up with anything because you're an appellee. Well, Your Honor, this Court is certainly free to affirm on alternate grounds. I think that proposition is well settled. The argument that this is not even a trade secret, which I think a number of the judges on the panel have asked about, is an alternate ground for an affirmance. If we don't have a trade secret, obviously the claim doesn't get off the ground. But the limitations period isn't because the district court has already held that it's a factual issue, and you're not really ‑‑ that you didn't even argue in your briefs, right? Your Honor, we raised the statute of limitations argument in the district court. Right. The district court ruled against us. So you didn't argue here that the district court was wrong about that? We did. That's the last argument in our brief, that the court can affirm on that ground because the district court was erroneous in believing that the statute of limitations did not bar the claim. Of course, here we have a 20‑year period preceding the filing of the complaint. As we included in our supplemental excerpts, there were four or five newspaper articles that by the end of 2002 would have alerted Mr. Carr to the existence of LKQ, to the industry. Here where they're relying on the discovery rule or equitable tolling, that does seem to be something that, though, would go to a factual development to make it helpful. I mean, I get that you brought in ‑‑ I think it is troubling that, to me, it almost goes to whether it was a trade secret. If he had these meetings and then kind of disappeared for 15 years and never went anywhere and then finds out that this is going on, it goes to the issue of how much of a trade secret it was. But it does strike me that statute of limitations is something, at least with the defense that they're raising, would be better addressed on summary judgment. Your Honor, I take your point, and I think you're right about the connection that can be drawn in terms of the delay and whether this really is a trade secret. The case I would point you to, though, on the delayed discovery issue is the McKelvey case, which is a California court of appeal decision in which media accounts, widespread media notice, was a sufficient basis to resolve on a demur, which is the ‑‑ Was that on a motion to ‑‑ that was on a motion to dismiss? Yeah, demur, which is the state court equivalent of a Rule 12 motion. But that still relies on a record, right? It relied on judicial notice of media reports, which is the same thing that we have here in this case. Yes, that's a record. That's evidence. It's facts. It's not in the complaint. It's not referred to in the complaint. Your Honor, what the McKelvey court said is it's ‑‑ there's no problem relying on judicial notice to resolve an issue at the demur stage because the statute ‑‑ and you can incorporate something that's ‑‑ a document that is referred to in the complaint, but you can't take something ‑‑ I mean, even if it's judicially noticed, it's still ‑‑ I mean, that it exists. It's not judicially noticed that he saw it. So it seems to me it's outside the record. Outside the complaint. It's not a 12B6. Your Honor, I need to defer the rest of my time to Mr. Rice. But I would encourage the court to affirm on all grounds. Thank you. Good morning, Your Honor. Joel Rice on behalf of defendant LKQ. The district court's dismissal of LKQ, the trade secret claim against LKQ, was proper and should be affirmed for two reasons. First, plaintiff did not state a claim for that LKQ had acquired his alleged trade secret. The claim against LKQ here I think is even more tenuous and attenuated than any claim against AutoNation. The events here ‑‑ Well, first of all, AutoNation's confidentiality issue flies. That's the edge of LKQ's argument. You don't have to do anything else. You prevail at that point. I'm sorry. If the district court's holding with regard to the confidentiality is affirmed, then we don't need to address any separate LKQ issue. I think that's correct. If the district court's conclusion that Carr did not take adequate efforts to keep his alleged trade secret secret, if that's affirmed, then obviously that runs in our favor as well. I think we do have another layer on top of that, which is that even if you felt there was some kind of a dispute here over whether Carr had done enough to keep that business plan secret vis‑a‑vis Mr. Davis, there's still the issue of how does LKQ, a company that didn't exist then and wasn't formed until three years later, how does it have the mens rea, the intent that California trade secret law requires, when it was not there? What percentage of LKQ did Herzinga have? Was he involved in the formation of LKQ? AutoNation was a minority shareholder in LKQ. How minority? Ten percent was at stake, so a small stake. Well, that depends on himself. Does Herzinga himself have any stake? I honestly don't know, and I don't know if the record reflects Mr. Herzinga's stake. I know that he was an owner of AutoNation, but they had a small stake. But you have to understand, it's pretty understandable, the founder of LKQ was a man named Donald Flynn, and he had been the CFO of Waste Management, another Herzinga company. So the notion that LKQ might have been an early investor in Mr. Flynn's company is really not probative of anything. The bottom line here is that. Well, it's probative of something. It means there was a connection, and therefore there's some decent probability that he told him this is a good idea. But it's not. I mean, we're really sort of at the margins of Iqbal at this point in terms of. . . I mean, it's not at all implausible that this happened. The question is how plausible does it have to be. Well, I would argue, obviously, that it is implausible because you do not have any indicia here that the specifics of Mr. Carr's business plan. If you read that business plan and then counsel compares it to LKQ's Form S-1 filing, I looked at it, the court can use its common sense. First of all, many of the parallels she points to are not even parallels. They don't even line up. And where they are parallel, it's at such a high vanilla level of generality. Any national company announcing that it's going to go into business and consolidate an industry is going to say the same things. There's nothing in that Form S-1 filing that suggests that there was something specific about what Mr. Carr put in that business plan that LKQ purloined. And again, I go back to the fact there's nothing here connecting Davis to LKQ. There's nothing here suggesting Davis is not an early founder, he's not an officer, he's not listed in LKQ's filing. There's no indication of any connection between those interactions, between Mr. Davis and Mr. Carr and LKQ, a company that didn't even exist at the time of those interactions. And although I think this is a pretty clear point, clearly Davis's conduct can't be imputed to LKQ. He was not LKQ's agent. It was a wholly separate company, didn't even exist at the time of these interactions with Carr. Clearly LKQ is not an alter ego of AutoNation, as plaintiff suggests in her appellate brief. She didn't even attempt to plead that in her complaint. So those theories fall by the wayside. And then I get back to what I said. One question is, we have cooperation here. The standard is that they would have to know that a trade secret wasn't properly disclosed. Who has to know this? I mean, we're dealing with an entity, not a person. Well, I mean, LKQ, obviously like any company, they act through the people that are their agents and officers. But, you know, that's not Mr. Davis, who was never employed by LKQ. And again, LKQ didn't even exist. There's no allegation here that suggests that Mr. Davis later spoke to anyone at LKQ. I agree that an entity has to act through its employees and officers, but there's no indication they did. There's no indication of any wrongdoing on the part of anyone at LKQ. And if someone at LKQ came into possession of that business plan, there's nothing on the face of that business plan that indicates that it was to be kept confidential. There's no reference to a nondisclosure agreement. And if they came into possession of that letter that Mr. Carr wrote to Mr. Davis on January 8th of 1996, he said, well, if you and your staff would like some more information about my ideas, I'll be happy to share those too. And he didn't say at the end of that sentence, but only if you keep it super secret. So nobody reading those documents would reasonably infer that this was something that this individual wanted to be kept as a trade secret. Okay, thank you very much. Your six minutes are expired. Thank you. I'll give you one minute. You have 49 seconds. We'll expand it to a minute. Thank you. Thank you, Your Honor. On the question of whether this business plan had any value, there's a plausible inference that it did because AutoNation, which is a massive publicly traded company, Mr. Carr is a guy in California who owns a junkyard. AutoNation read the business plan and then sent somebody across the country to learn more. But that doesn't mean it had value. I mean, there's plans all the time that people want to look at, and then they decide it doesn't have value. It means it raises a plausible inference that the plan did have value to AutoNation. And, again, we're looking back 20 years. And on the 20-year point, Mr. Carr, again, he's done a lot of different things in his career. He started as an accountant. He owned junkyards for about 10 years. He thought he could do something bigger. That's what he wanted to do. He pitched about 12 different people. He got rejected mostly summarily by almost everybody. AutoNation itself said, we don't want this idea. He moved on. And the statute of limitations, and in terms of whether it was a trade secret going 20 years, the value was being the first. Starbucks is first. People say there's a Starbucks on every corner. They don't say there's a coffee bean on every corner. LKQ started. Ford got in the game a year later. They were never able to catch LKQ. LKQ bragged about being first. Thank you. Your time is up. Thank you very much. Thank you both for your argument. Carr v. AutoNation is submitted.
judges: Berzon, Nelson, Lee